**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES and LEE ANNE D., | ) | |
| Individually and as Next Friends | ) | |
| of Sarah D., a Minor, | ) | |
| | ) | |
| Plaintiffs | ) | Case No. 07-cv-7018 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| Board of Education of Aptakisic-Tripp | ) | |
| Community Consolidated School District | ) | |
| No. 102, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Plaintiffs' motion for summary judgment [53] and Defendant's cross-motion for summary judgment [57]. Plaintiffs, James and Lee Anne D., individually and as next friends of their minor daughter, Sarah D., bring this Individuals with Disabilities Education Act ("IDEA") suit, 20 U.S.C. §§ 1400-1491, against the Board of Education of Aptakisic-Tripp Community Consolidated School District No. 102 ("District"). Plaintiffs are appealing an administrative decision, issued by an Impartial Hearing Officer ("IHO"), finding that the District complied with the IDEA, and denying Plaintiffs' request for reimbursement for the cost of tuition at a private special education school. The cross-motions have been fully briefed. For the reasons set forth below, the Court denies Plaintiffs' motion for summary judgment and grants the District's motion for summary judgment.

# I.    Factual Background[1]

Sarah is ten year old girl who has severe developmental dyslexia, a learning disorder that makes it difficult for her to learn to read.  Def. Resp. Pl. SOF ¶¶ 4, 5.  She is eligible for special education as a student with a learning disability and a speech-language impairment.  *Id.* ¶ 5.  Sarah attended Pritchett Elementary School ("Pritchett"), which is operated by the Defendant District, from kindergarten through the third grade.  Pl. Resp. Def. SOF ¶ 6.

Sarah began receiving special education instruction at Pritchett in the first grade (2004-2005), at which time she received 800 minutes of special education instruction per week.  Def. Resp. Pl. SOF ¶ 15.  At the end of Sarah's first grade year, the District recommended that Sarah enroll in extended school year services ("ESY") for the summer to prevent regression.  Pl. Resp. Def. SOF ¶ 26.  Sarah's parents declined to enroll her in ESY at the District; instead, Sarah had private tutoring during the summer between her first and second grade years.  AR 2012-13; 2649-50.

In second grade (2005-2006), the amount of time that Sarah spent receiving special education instruction increased to 830 minutes per week, which is approximately 48.8% of the week.  AR 393.  On April 20, 2006, Sarah's parents and representatives from the District met to develop an Individualized Education Program ("IEP") for Sarah's third grade year.[2]  AR 1293.  At that meeting, the team agreed to increase Sarah's special education minutes to 900 minutes

---

[1] The Court takes the relevant facts from the Administrative Record ("AR") and the parties' respective Local Rule 56.1 statements of material fact: Plaintiffs' Statement of Facts ("Pl. SOF") [54], Defendant's Statement of Facts ("Def. SOF") [59], Defendant's Response to Plaintiffs' Statement of Facts ("Def. Resp. Pl. SOF") [61], and Plaintiffs' Response to Defendant's Statement of Facts and Reply to Additional Facts ("Pl. Resp. Def. SOF") [67].

[2] The IDEA provides that, for each disabled student, a school district must formulate an IEP, "which is written statement that maps out how a school district will provide an IDEA-compliant education" for that student.  *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221,* 375 F.3d 603, 606 (7th Cir. 2004).  IEPs are developed by the "IEP team," which is composed of the student's parents, teachers, and other school district representatives.  20 U.S.C. § 1414(d)(1)(B).

per week (or 53% of the time) for her third grade year. AR 393. At the end of Sarah's second grade year, Sarah's parents again declined the District's recommendation that Sarah enroll in ESY for the summer. Pl. Resp. Def. SOF ¶ 26. Instead, Sarah's special education teacher from the District tutored her once a week that summer. AR 2013, 2045.

On November 30, 2006, in the fall of Sarah's third grade year, Sarah's IEP team met to discuss the 3-year re-evaluation required by the IDEA. 20 U.S.C. § 1414(a)(2). As part of Sarah's 3-year re-evaluation, the school psychologist completed a comprehensive psychoeducational evaluation of Sarah to assess her cognitive abilities, processing skills, and emotional and behavioral functioning. AR 1008. At the November 30, 2006 meeting, Plaintiffs shared with the rest of the IEP team an independent evaluation of Sarah conducted by a dyslexia clinic. Def. Resp. to Pl. SOF ¶ 45. The IEP team decided to stop the meeting and reconvene on December 8, 2006 so that the District representatives could read the report. *Id.*; AR 468, AR 474. When the IEP team reconvened on December 8th, the District "rejected" the report. AR 474. Also on December 8, 2006, the IEP team decided to have Sarah evaluated by the District's assistive technology facilitator to determine whether she could benefit from additional assistive technology services. AR 471.

The IEP team met again on February 8, 2007 to review the assistive technology evaluation and to discuss the new computer programs that they were using with Sarah. AR 577. At this time, Sarah's special education minutes again were increased to 990 minutes per week. At the February meeting, Plaintiffs expressed their view that a private placement might be most appropriate for Sarah. AR 580, 588. After reviewing the placement options, the team concluded that placement at Pritchett was appropriate, and that a private placement would be too restrictive. AR 588.

On May 3, 2007, the team met to formulate an IEP for Sarah's fourth grade year. AR 667. The team again discussed Sarah's placement, and her parents' view that Sarah should be placed at a private day school. AR 647. The team could not agree on an appropriate placement for Sarah. AR 648. Plaintiffs dissented from the District's recommendation that Sarah be placed at Pritchett. AR 679.

Between third and fourth grade, Sarah was enrolled in a reading program at Hyde Park Day School ("HPDS"), a state-approved private school for children with learning disabilities. Def. Resp. Pl. SOF at ¶ 53. Unhappy with what they perceived as Sarah's lack of progress after three years of special education at Pritchett, on June 18, 2007, Sarah's parents unilaterally enrolled her at HPDS for the 2007-08 school year. Def. Resp. Pl. SOF at ¶ 56.

## II.    Procedural Background

In July 2007, Sarah's parents requested a due process hearing, as provided for in the IDEA, 20 U.S.C. § 1415(b)(2), claiming that the District had denied Sarah access to a free appropriate public education ("FAPE"), as required by the IDEA, and seeking reimbursement for their unilateral placement of Sarah at HPDS. At issue in the IDEA administrative hearing was Sarah's education during the 2005-06 and 2006-07 school years – her second and third grade years – and the proposed IEP for the 2007-08 school year. AR 1845.

Prior to the due process hearing, Sarah's parents filed a number of motions with the IHO, including a motion for leave to observe the classroom in which the District proposed to place Sarah for her fourth grade year, a motion requesting that the IHO recuse himself based on what Plaintiffs perceived as evidence of his lack of impartiality, and a motion to move the due process hearing to a location other than Pritchett, all of which the IHO denied. AR 3.

At the outset of the due process hearing, the IHO summarized the issues for consideration at the hearing as follows:

(1) whether the school district failed to provide Sarah with a reading program that enabled her to make meaningful progress per 20 U.S.C. § 1414(d), 34 C.F.R. § 300.320;

(2) whether the school district failed to provide Sarah with an appropriate IEP per 20 U.S.C. § 1414(d), 34 C.F.R. § 300.320, 34 C.F.R. § 300.324, I.A.C. 226.230;

(3) whether the school district failed to provide Sarah with an appropriate placement pursuant to 20 U.S.C. § 1412(a)(5), 34 C.F.R. § 300.115;

(4) whether the school district failed to address all of Sarah's educational needs, which consists of language arts, math, executive functioning, and social/emotional needs, in addition to reading, pursuant to 20 U.S.C. § 1414(d), 34 C.F.R. § 300.320; and

(5) whether the school district failed to adequately consider private evaluation tendered by Sarah's parents pursuant to 34 C.F.R. § 300.324.

AR at 1759-1760; see also AR 4. Following a three-day hearing, the IHO decided all of the issues in favor of the District, and denied Plaintiffs' request for reimbursement. AR 12-15.

Plaintiffs filed a complaint in this case on December 13, 2007, appealing the IHO's decision and order.[3] On March 20, 2008, Plaintiffs filed a Motion to Supplement the Administrative Record [28], which the District opposed. On August 12, 2008, the Court granted Plaintiffs leave only to supplement the administrative record [36] with respect to (1) FACTS documentation, (2) a PowerPoint presentation related to "inclusion" prepared by the District and published on its website, and (3) a December 2007 occupational therapy evaluation and a

---

[3] The complaint named both the District and the Illinois State Board of Education ("ISBE") as Defendants. On March 20, 2008, the Court granted Plaintiffs' motion to voluntarily dismiss the ISBE as a defendant.

January 2008 progress report.[4]  On January 6, 2009, Plaintiffs' filed a motion for summary judgment.  The District filed its cross motion for summary judgment on January 27, 2009.

## III.    Standard of Judicial Review

The traditional summary judgment standard set forth in Federal Rule of Civil Procedure 56 does not apply to cases arising under the IDEA.  *Evanston Cmty. Consol. Sch. Dist. No. 65 v. Michael M.,* 356 F.3d 798, 802 (7th Cir. 2004).  The IDEA provides that a court reviewing the outcome of a due process hearing "(i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines appropriate."  20 U.S.C. § 1415(i)(2)(C).  Therefore, despite being faced with cross motions for summary judgment, this Court's decision must be based on the preponderance of the evidence, and not on whether there are any genuine issues of material fact.  *Todd v. Duneland School Corp.*, 299 F.3d 899, 904 (7th Cir. 2002).

In IDEA cases, district courts are required to "give 'due weight' to the results of the administrative decisions and should not substitute 'their own notions of sound educational policy for those of the school authorities which they review.'"  *Bd. of Educ. of Murphysboro Community Unit Sch. Dist. No. 186 v. Illinois State Bd. of Educ.,* 41 F.3d 1162, 1166 (7th Cir. 1994) (quoting *Bd. of Educ. v. Rowley,* 458 U.S. 176, 206 (1982)).  This measure of deference to the final administrative decision recognizes that "courts do not have special expertise in the area of educational policy," while hearing officers do.  *Id.* at 1166-67.  What constitutes "due weight" varies depending on the amount of new evidence considered by the district court.  *Alex R. ex rel. Beth R. v. Forrestville Valley Cmty. Unit Sch. Dist. No. 221,* 375 F.3d 603, 612 (7th Cir. 2004).

---

[4] The Court denied Plaintiffs' request to supplement the record with affidavits of Ama Thompson, a reading expert who was retained to evaluate Sarah and who testified at the due process hearing, and Lee Anne D., Sarah's mother.

Where the district court does not consider any additional evidence, "the fact that [it] disagrees with the [hearing] officer is not enough to justify setting aside the latter's order; [the court] must be strongly convinced that the order is erroneous." *Dale M. ex rel. Alice M. v. Board of Educ. of Bradley-Bourbonnais High School Dist. No. 307*, 237 F.3d 813, 815 (7th Cir. 2001). If the court does consider additional evidence, "[t]he more that [it] relies on new evidence, * * * the less it should defer to the administrative decision," but under no circumstances should the district court "go so far as to conduct a trial de novo." *Alex R.,* 375 F.3d at 612. Here, although the Court has allowed Plaintiffs to supplement the record with four additional documents, their use and import are not extensive. Therefore, the Court generally gives considerable deference to the administrative decision.[5]

The Seventh Circuit has explained that while district courts are require to give "due weight" to the decisions of the hearing officers, they must nevertheless "independently evaluate * * * the testimony of witnesses [and] the evidence." *Heather S. v. State of Wis.*, 125 F.3d 1045,

---

[5] Plaintiffs allege that the IHO made a number of erroneous findings of fact, and that the administrative decision should be overturned for that reason. While the existence of significant factual errors would not necessarily provide a basis for overturning the IHO's decision, it would indicate that the IHO's findings were not entitled to any deference. See *Teague Independent School Dist. v. Todd L.*, 999 F.2d 127, 131 (5th Cir. 1993) (the IDEA "does not state that the district court must defer to [the IHO's] findings when its own review of the evidence indicates that the hearing officer erroneously assessed the facts"). However, after a thorough review of the record, the Court concludes that Plaintiffs have failed to show that any of the IHO's factual findings were clearly erroneous. Two of the alleged factual errors concern the weight the IHO accorded to certain testimony. See Cmplt. ¶ 62 ("IHO erroneously dismissed the testimony of two private evaluators * * * [and] Sarah's special education teacher * * * that * * * Sarah [should] make nine months of reading progress in a school year"); *id.* ¶ 67 (same). But "[t]he fact that the IHO credited some witnesses over others and chose not to address every witness' testimony in [his] opinion is not a basis to overturn [his] decision." *Board of Educ. of Tp. High School Dist. No. 211 v. Michael R.*, 2005 WL 2008919, at *23 (N.D. Ill. Aug. 15, 2005). There is ample support in the record for the other challenged findings of fact. For example, Plaintiffs claim that "the IHO incorrectly found that [HPDS] does not individualize its program to the individual needs of students." Cmplt. ¶ 66. Plaintiffs' characterization of the IHO's finding is not entirely accurate; in fact, the IHO concluded that HPDS "does not provide each student with an IEP." AR 11. In any event, the challenged finding is supported by the record evidence. See AR 2186-88 (testimony of HPDS principal that HPDS provides students with Individualized Learning Plans ("ILPs"), not IEPs, and that some ILP goals are "general" for all students, as opposed to individually tailored to the specific student).

1053 (7th Cir. 1997). Therefore, "in its independent evaluation of the evidence," this Court will "give due deference to the results of the administrative proceedings." *Beth B. v. Van Clay*, 282 F.3d 493 (7th Cir. 2002). This Court reviews the IHO's decisions of law *de novo*. *Alex R.,* 375 F.3d at 611.

As the party challenging the IHO's decision, the Plaintiffs bear the burden of proving their claims by a preponderance of the evidence. See *Patricia P. v. Bd. of Educ.*, 203 F.3d 462, 466-67 (7th Cir. 2000).[4]

## IV.    The IDEA

The IDEA "requires States receiving federal funding to make a 'free appropriate public education' (FAPE) available to all children with disabilities residing in the State." *Forest Grove School District v. T.A.*, 129 S.Ct. 2484, 2492 (2009) (citing §1412(a)(1)(A)). "A free appropriate public education is one 'specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction.'" *Murphysboro*, 41 F.3d at 1166 (quoting *Rowley,* 458 U.S. at 188-89). The IDEA aims to achieve the goal of making a FAPE available to all children with disabilities by requiring that States accepting federal funds for the education of disabled children adhere to two statutory obligations, *Alex R.*, 375 F.3d at 611, one procedural and one substantive, *Ross*, 486 F.3d  at 273-74. To comply with the IDEA's procedural component, a school district must follow the "guaranteed procedural safeguards" set forth in the Act. 20 U.S.C. § 1415(a). To comply with the statute's substantive component, a school district must "develop an [individualized educational program

---

[4] Similarly, the burden of proof in the underlying administrative due process hearing is on the party challenging the educational placement. See *Bd. of Educ. v. Ross*, 486 F.3d 267, 270-71 (7th Cir. 2007) (citing *Schaffer v. Weast*, 546 U.S. 49, 51 (2005)).

("IEP")] through those procedures that is reasonably calculated to enable the child to receive educational benefits." *Murphysboro*, 41 F.3d at 1166.

Therefore, courts engage in a two-part inquiry to determine whether a school district has complied with the IDEA. *Rowley*, 458 U.S. at 206. First, a court considers whether the district has complied with the procedures set forth in the statute. *Id.* A district's failure to comply with the procedural requirements does "'not automatically require a finding of a denial of a [FAPE].'" *Ross*, 486 F.3d at 276. Procedural violations can be held to deny a student a FAPE only if they "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded Plaintiffs' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to Plaintiffs' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii). Second, a court asks whether the IEP is reasonably calculated to enable the child to receive educational benefits.[6] *Rowley*, 458 U.S. at 207. An IEP is reasonably calculated to confer educational benefit when it is "'likely to produce progress, not regression or trivial educational advancement.'" *Alex R.*, 375 F.3d at 615 (citation omitted). The Seventh Circuit has stated that the "requisite degree of reasonable, likely progress varies, depending on the student's abilities." *Id.* ("while one might demand only minimal results in the case of the most severely handicapped children, such results would be insufficient in the case of other children"). "Objective factors, such as regular advancement from grade to grade, and achievement of passing grades, usually show satisfactory progress." *Id.*

---

[6] Plaintiffs' contention that *Rowley* is no longer the governing standard, and that the IDEA requires the District to maximize Sarah's potential to read, is incorrect. See *Hjortness ex rel. Hjortness v. Neenah Joint School District,* 507 F.3d 1060, 1064 (7th Cir. 2007) (applying the substantive standard set forth in *Rowley* and stating "[t]o be substantively appropriate, the IEP must be formulated so that [the student] would receive the 'basic floor of opportunity'").

Once a school district has satisfied the procedural and substantive requirements of the IDEA, "the courts cannot require more; the purpose of the IDEA is to 'open the door of public education' to handicapped children, not to educate a handicapped child to her highest potential." *Murphysboro*, 41 F.3d at 1166 (citation omitted).

## V.    Analysis

### A.    Procedural Arguments

A number of Plaintiffs' claims relate to the first *Rowley* inquiry: whether the State has complied with the procedures set forth in the IDEA.[7]  Plaintiffs have alleged the following procedural violations: (1) Sarah's IEPs lacked measurable goals; (2) the District denied Sarah's parents meaningful participation in the IEP process; (3) the IHO deprived Sarah's parents equal access to evidence by denying their motion to observe the District's proposed classroom; (4) the IHO failed to hold the administrative hearing in a neutral location; (5) the IHO engaged in improper *ex parte* communication with the District's attorney; and (6) the District violated the IDEA by only offering Sarah placement at Pritchett, and thereby failing to offer her a continuum of placements.

#### 1.    *Lack of Measurable Goals*[8]

---

[7] Plaintiffs do not necessarily characterize their challenges as procedural or substantive.  However, this Court must distinguish between the two as the nature of the challenge determines the standard of review.

[8] Plaintiffs characterize the alleged lack of measurable goals as a substantive violation.  However, most other courts have treated lack of measurable IEP goals as a procedural violation.  See *Edwin K. v. Jackson*, 2002 WL 1433722, at *13 (N.D. Ill. July 02, 2002); *Stanley C. v. M.S.D. of Southwest Allen County Schools*, 2008 WL 5423486, at *53 (N.D. Ind. Dec. 29, 2008); *Virginia S. v. Dept. of Educ.*, 2007 WL 80814, at *7 (D. Haw. Jan. 8, 2007); *Leticia H. v. Ysleta Independent School Dist.*, 502 F.Supp.2d 512, 518 (W.D. Tex. 2006); *D.B. v. Ocean Tp. Bd. of Educ.*, 985 F.Supp. 457, 536 (D. N.J. 1997); *M.C. ex rel. B.C. v. Rye Neck Union Free School Dist.*, 2008 WL 4449338, at *11 (S.D.N.Y. Sept. 29, 2008); *Adam J. ex rel. Robert J. v. Keller Independent School Dist.*, 328 F.3d 804, 811 (5th Cir. 2003).  But see *Kevin T. v. Elmhurst Cmty. Sch. Dist. No. 205*, 2002 WL 433061, at *5 (N.D. Ill. Mar. 20, 2002) (analyzing alleged deficiencies in IEPs, including alleged lack of measurable goals, under the *Rowley* substantive analysis);  *Caitlin W. v. Rose Tree Media School Dist.*, 2009 WL 1383304, at *6 (E.D. Pa. May 15, 2009) (same).  Moreover, in *Rowley*, the Court explained that the procedural "inquiry will

Plaintiffs first contend that the goals set forth in Sarah's IEPs were not measurable, as required by the IDEA and Illinois' special education regulations. 20 U.S.C. §1414(d)(1)(A)(i)(II) (IEP must contain "a statement of measurable annual goals, including academic and functional goals"); 23 Il. Adm. Code 226.230(a)(1).[9] The IEPs at issue each set forth broad annual goals for improvement, and listed a number of short term objectives under each broad goal. See AR 1259 (5/6/05 IEP); AR 1279 (4/20/06 IEP); AR 1383 (5/3/07 IEP). For example, the IEP dated 4/20/06 includes the following goal: "Sarah will improve reading skills and read with understanding from her current level by completing the following objectives." AR 1279. Under that goal, the first short term objective is "when reading independently, Sarah will decode a variety of reading materials at her current instructional level, 8 of 10 times that she is assessed." *Id.*

After each short term objective appears Sarah's present level of performance for the particular task. For example, for the short term objective stated above, the 4/20/06 IEP states that Sarah "currently knows short a, short i, short o, has been learning short u, short e patterned word books, A and B levels." *Id.* Beneath each short term objective there is space for comments regarding the student's progress toward meeting that objective. *Id.* Sarah's progress toward mastering her objectives was evaluated each grading period. AR 1279 (stating on 6/5/06 that Sarah "currently has averaged 71% mastery" and "vowels have improved").

---

require a court not only to satisfy itself that the State has adopted the state plan, policies, and assurances required by the Act, but also to determine that the State has created an IEP for the child in question which conforms with the requirements of § 1401(19)." 458 U.S. at 206-07 n.27. When *Rowley* was decided, § 1401(19) set forth the requirements for an IEP, including that it include "a statement of annual goals, including short-term instructional objectives." *Id.* at 182. Therefore, this Court will analyze the alleged lack of measurable goals in Sarah's IEPs as a procedural challenge.

[9] The IHO did not specifically address this objection. However, the IHO's decision states that its "discussion of facts and conclusions of law are applicable to the issues presented in the original complaint." AR 4. Plaintiffs' initial request for a due process hearing complained that Sarah's IEPs lacked measurable goals. AR 19-20. Therefore, the Court will consider this argument.

The Court concludes that the short term objectives in Sarah's IEPs are specific and capable of measurement, and therefore the IEPs sufficiently comply with the requirements of the IDEA concerning the inclusion of measurable goals.

### 2. *Denial of Meaningful Participation in IEP Process*

Plaintiffs contend that the District denied them meaningful participation in the IEP process by refusing to consider the independent evaluation of Sarah completed by a dyslexia clinic, which Plaintiffs shared with Sarah's IEP team at the November 2006 IEP meeting. Def. Resp. to Pl. SOF ¶ 45. When Plaintiffs presented the rest of the team with the evaluation, the team decided to reconvene the meeting at a later date so that the District representatives could read and review the evaluation. AR 2245. On December 8, 2006, when the IEP meeting reconvened, the District informed Plaintiffs that it had "rejected" the independent evaluation. AR 474. The District did not discuss the evaluation with Plaintiffs prior to rejecting it. AR 2245-46.

The school psychologist, who took notes at the December 8th meeting, testified that when Plaintiffs presented the evaluation during the November 30th meeting, the IEP team decided to reconvene the meeting later so that they could "read the report." AR 2245. The minutes from the November meeting corroborate the school psychologist's testimony, stating that "[t]he team agreed to postpone the meeting to review outside evaluation." AR 468; see also AR 474 (notes from 11/30/06 meeting stating "parents submitted an outside evaluation and the team needs time to read"). The school psychologist further testified that the IEP team read the evaluation at issue and reviewed it prior to the December 8th meeting, outside the presence of Plaintiffs. AR 2245-46. She testified that the team "rejected" the report, in part, because it

stated that only one approach – the Orton-Gillingham methodology – was appropriate for Sarah. AR 2277-78.

While the IDEA requires that school districts consider the results of independent educational evaluations obtained by parents, 34 C.F.R. §300.502(c)(1), the federal regulations do not require "that there be substantive discussion of" such evaluations. *G.D. v. Westmoreland School Dist.*, 930 F.2d 942, 947 (1st Cir. 1991). In light of the testimony that the District considered the evaluation and rejected it, the IHO concluded that the District had adequately considered the evaluation. AR 14. The Court finds that the preponderance of the evidence – including the school psychologist's testimony, the documentary and testimonial evidence that the IEP team stopped the November meeting in order to review the evaluation, and the minutes from the November and December meetings – supports the IHO's conclusion that the District appropriately considered the evaluation, as required by the IDEA, but chose not to accept its recommendations. Because nothing in the IDEA required the District to implement the independent evaluation's recommendations, Plaintiffs' claim fails.

> 3.    *Denial of Parents' request to allow Sarah's evaluator observe the classroom proposed for Sarah by the District*

Plaintiffs argue that the IHO's denial of their motion for leave to observe the classroom in which the District proposed to place Sarah for her fourth grade year deprived them of equal access to evidence. Plaintiffs rely on *Schaffer v. Weast*, 546 U.S. 49, 60-61 (2005), in which the Supreme Court observed that by giving parents "the right to an 'independent educational evaluation of the[ir] child[,]' * * * IDEA * * * ensures parents access to an expert who can evaluate all the materials that the school must make available, and who can give an independent opinion." (quoting 20 U.S.C. § 1415(b)(1)). In denying Plaintiffs' motion, the IHO noted that he had the authority to order an independent educational evaluation, which could include

observation of the student in the learning environment. AR 45. However, the IHO concluded that the regulations did not grant him "the authority to order an evaluation of a program sans the student," and that observing a classroom without the student would not yield any relevant information. *Id.* Plaintiffs have cited no authority indicating that the IHO in fact had the power to grant their motion. Moreover, even if the IHO had the authority to order the requested observation, the Court finds the IHO's conclusion that such an observation – one without the student present – would not be helpful to be reasonable and not contrary to law. Therefore, the Court concludes that the IHO's denial of Plaintiffs' request did not constitute a procedural violation of the IDEA.

### 4. *Alleged Procedural Violations Demonstrating IHO's Lack of Impartiality*

Plaintiffs also argue that the IHO committed two procedural violations that demonstrate his lack of impartiality in this matter. The Court finds Plaintiffs' assertion of bias to be unfounded.

First, Plaintiffs object that the hearing was not held in a neutral location. Prior to the due process hearing, the IHO denied Plaintiffs' request that the hearing be held at a neutral location other than the school, on the grounds that the school was the most convenient location, and Plaintiffs had failed to show that their case would be jeopardized by holding the hearing there. AR 139. The Illinois School Code requires that the administrative hearing be held in a neutral location at the request of a party. 105 ILCS 5/14-8.02a(g).

While it is difficult to conceive of concepts such as "neutrality" or "home field advantage" as they may relate to a hearing room, the Court will assume for present purposes that the IHO erred in refusing to relocate the due process hearing. Nevertheless, the Court cannot conclude that this procedural violation denied Sarah a FAPE unless it "(I) impeded the child's right to a free appropriate public education; (II) significantly impeded Plaintiffs' opportunity to

participate in the decisionmaking process regarding the provision of a free appropriate public education to Plaintiffs' child; or (III) caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii).[10] Plaintiffs do not attempt to demonstrate how the location of the due process hearing denied Sarah a FAPE. Rather, Plaintiffs claim that Sarah's mother was uncomfortable having the due process hearing at Pritchett, because she previously was employed there, and that Palintiffs were concerned that their confidentiality would be compromised because they knew many of the staff members and parents at the school.[11] While these are legitimate concerns, the Court cannot conclude that the location of the hearing denied Sarah a FAPE, or that the denial of their motion demonstrates partiality on the part of the IHO.

Second, Plaintiffs contend that the IHO improperly engaged in *ex parte* communications with the District's counsel regarding the final evidentiary disclosure date. The IHO's pre-hearing conference report scheduled the due process hearing for October 29, 2007 – October 31, 2007, and set a final disclosure date of October 9, 2007. AR 125-26. In their objections to the pre-hearing conference report, Plaintiffs objected to the disclosure date on the grounds that federal and state law provide for a disclosure date of five days before the hearing. AR 128, 131. The IHO neither addressed that objection, nor changed the disclosure date in his letter responding to the parties' objections to the pre-hearing conference report. AR 133. However, on October 8, 2007, following a conference call with the parties' attorneys, the IHO changed the disclosure date to October 22, 2007, five days before the hearing was set to begin. AR 136.

---

[10] Like procedural violations committed by school districts, procedural violations committed by the IHO in conducting due process hearings only violate the IDEA if they "result in the loss of educational opportunity." *Heather S.*, 125 F.3d at 1059 (finding that IHO's excessive delay in issuing a decision did not violate the IDEA where it did not result in the denial of free appropriate public education).

[11] Plaintiffs raised neither of these concerns in their letter requesting that the location of the hearing be changed. AR 1628.

Plaintiffs contend that the IHO changed the date following an *ex parte* conversation with the District's counsel, in which the District's counsel told the IHO that he was having trouble complying with the original disclosure deadline. At the start of the due process hearing, counsel for the District read a statement into the record explaining the alleged *ex parte* communication. AR 137-38. According to that statement, counsel for the District was on the phone with the IHO on another matter when the IHO stated that he had made a mistake in setting the disclosure date in the Sarah D. matter. AR 138. The IHO then conferenced Plaintiffs' counsel into the call and discussed changing the disclosure date. *Id.* The District's version of the events is corroborated by a letter from plaintiffs' own attorney to the IHO and the District's attorney confirming the October 8th teleconference. AR 1597. Moreover, in his letter responding to the parties' objections to the pre-hearing conference report, the IHO referenced the "5-day disclosure date," which corroborates the IHO's statement that he made a mistake about the date. AR 133. The Court concludes that there was no improper *ex parte* communication, and that the events surrounding the change of the disclosure date do not demonstrate any partiality on the part of the IHO.

### 5. *Continuum of Placements*

Plaintiffs contend that the District violated the IDEA by only offering Sarah placement at Pritchett, and thereby failing to offer her a continuum of placements, including a private placement. Put another way, Plaintiffs contend that the District predetermined Sarah's placement at Pritchett before meeting with them and without considering their belief that Sarah needed to be placed at a private school. According to Plaintiffs, the district has an unwritten policy against placing students in private placements out of the district. The District responds that it did consider placing Sarah in a private day school with only students with disabilities, as Plaintiffs requested, but rejected that option as too restrictive.

Plaintiffs base their argument primarily on evidence that was excluded by the IHO, but which this Court allowed them to add to the administrative record, namely, FACTS documentation and a PowerPoint presentation related to "inclusion" published on the District website. In the briefing on Plaintiffs' motion to supplement the administrative record, the District argued that Plaintiffs did not raise the issue of predetermination or the District's alleged policy against out-of-district placements in their initial due process complaint, at the pre-hearing conference, or in their response to the IHO's pre-conference report. [32, 4-5]. Plaintiffs responded that the evidence was relevant to whether the school district failed to provide Sarah with an appropriate placement pursuant to 20 U.S.C. § 1412(a)(5), an issue that was raised in their initial due process complaint and addressed by the IHO. In allowing Plaintiffs to supplement the record with the FACTS documents and the inclusion presentation, this Court cautioned that it would only consider the documents as they relate to Sarah's placement, and would not address any issues not properly raised and preserved before the IHO. [36, 4].

As an initial matter, the Court must address whether Plaintiffs waived the question of whether the District committed a procedural violation of the IDEA by failing to offer Sarah a continuum of placements. Plaintiffs do not appear to have raised the precise procedural challenge at issue – the District's alleged failure to offer a continuum of placements – prior to the due process hearing. While Plaintiffs did raise the broader issue of the appropriateness of Sarah's placement in their initial due process complaint, the Court doubts that Plaintiffs properly raised and preserved the question of whether the District offered a continuum of placements simply by raising the larger issue of her placement. However, Plaintiffs' attorney may have preserved the issue by addressing it in opening and closing statements at the due process hearing.

Yet even if Plaintiffs did not waive the issue, the Court finds their claim that the District predetermined Sarah's placement to be without merit. The IDEA requires that each public agency "ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." 34 C.F.R. § 300.115(a). Courts have held that "the placement decision must be based on the IEP produced by the IEP team and cannot be made before the IEP is produced." *Board of Educ. of Tp. High School Dist. No. 211 v. Michael R.*, 2005 WL 2008919, at *14 (N.D. Ill. Aug. 15, 2005) (citing *Spielberg v. Henrico County Public Schools*, 853 F.2d 256, 258-59 (4th Cir. 1988)). Consequently, a school district's "unilateral decision to change a student's placement before the IEP meeting with the student's parents, referred to as 'predetermination,' can constitute a violation of the IDEA." *Id.*

At the same time, the IDEA also requires that school districts provide a FAPE in the "least restrictive environment" ("LRE") possible. 20 U.S.C. § 1412(5); see also *Ross*, 486 F.3d at 273. In order to satisfy the LRE requirement, in selecting the appropriate placement along the continuum of alternatives, a "district must mainstream [a student] – that is, provide her an education with her nondisabled peers – to the 'greatest extent appropriate.'" *Beth B. v. Van Clay*, 282 F.3d 493, 498 (7th Cir. 2002). To determine whether keeping a child in a regular school is appropriate, the Seventh Circuit has directed courts to "ask whether the education in the conventional school was satisfactory and, if not, whether reasonable measures would have made it so." *Ross*, 486 F.3d at 273. A student "may not be removed from the regular classroom unless their education there, with the use of supplementary aids and services, cannot be achieved satisfactorily." *Beth B.*, 282 F.3d at 498. Thus, if a student's education at a regular public school is satisfactory, "the school district would be in violation of the Act by removing her." *Id.* at 499.

With those standards in mind, the Court turns to Plaintiffs' challenge. The Court notes that the District is not required to offer parents a variety of placement options for their children and allow them to choose, as Plaintiffs appear to suggest. Rather, the IDEA merely requires school districts to have a continuum of alternative placements *available*, and to select the appropriate placement based on the IEP produced at by the IEP team, including the student's parents. Therefore, the pertinent inquiry is whether the District considered a number of alternative placements for Sarah after receiving input from her parents.

Plaintiffs base their claim that the District did not consider out-of-district placements for Sarah on the theory that the District has an unwritten policy against private placements. In support of that theory, Plaintiffs point to the testimony of the school principal and the school psychologist that the District had not recommended a private placement in any of the IEP meetings they had attended in approximately the past 2 years. D Resp. to Pl. SOF ¶ 74. But the fact that, over the course of approximately two school years, two District employees had not recommended private placement does not compel the conclusion that the District refused to place students in private programs. In light of the fact that the IDEA prohibits the District from recommending private placement unless a student cannot be satisfactorily educated in the regular classroom, the lack of private placements may indicate that the District is well-equipped to educate students with disabilities, or that no students had disabilities so severe as to require private placement.

Plaintiffs also cite the inclusion presentation that appeared on the District's website and the FACTS documentation, both of which this Court admitted to supplement the administrative record, in support of their claim. The inclusion presentation is a 49-page PowerPoint presentation. [37]. Each slide contains a quote from educators, writers, and others, many of

which advocate inclusion and diversity.  *Id.*  Only one slide relates directly to the placement of disabled students.  It shows the following quote, which is attributed to J. Hackett: "Indian Prairie School District meets the needs of all children within their least restrictive environment.  This environment, for many students is within their home school with their neighbor hood peers." [37-3].  The Court finds that the inclusion presentation does not suggest that the District has a policy against private placement.  Generally, the presentation promotes diversity and the acceptance of people's differences.  The one slide that addresses placement merely makes a fairly obvious observation – that many students can be satisfactorily educated with their nondisabled peers.  See *Ross*, 486 F.3d at 277 (LRE requirement "requires the District to educate Lindsey with her nondisabled peers – known as 'mainstreaming' her – * * * [if] education in the conventional school was satisfactory").

Finally, Plaintiffs point to the FACTS documentation, which is data that the District submitted to the Illinois State Board of Education pursuant to the State of Illinois Special Education Funding and Child Tracking System.  Pl. SOF ¶ 72, [61-2, Clark Aff. at ¶ 7].  According to Plaintiffs, the FACTS data (a summary of which appeared in the administrative record at AR 1748) shows that the number of private placements made by the District fell from 14 in 2002 to 5 in 2007.  The District responds that it had approximately 11 students in private placements at the time of the hearing (October 2007), and 15 students in private placements in January 2009.  [61-2, Clark Aff. at ¶ 9].  In view of this conflicting evidence, it is not clear that the District's number of private placements has consistently fallen in recent years.  And even if the Court could be confident that the number of private placements had dropped, that decrease alone – without any information regarding the students at issue and their disabilities – would not be sufficient to convince the Court that the District has an unlawful policy.

The Court concludes that, taken together, the testimonial and new evidence on which Plaintiffs rely is not sufficient to establish that the District has adopted an unlawful policy against private placements. This conclusion is confirmed by the record evidence, which indicates that the District did consider more than one placement for Sarah, including placement at a private school.

Each of Sarah's IEPs contains a section entitled "educational placement options," which lists various alternative placements in order of how restrictive they are.[12] See AR 1293. The paperwork from each of Sarah's IEP meetings indicates that the District considered a number of placement options for Sarah, including placement at a separate facility, but ultimately concluded that the placement at Pritchett was most appropriate. See AR 1293 (4/20/2006 IEP meeting); AR 1335 (11/30/2006 IEP meeting); AR 1354 (2/8/2007 IEP meeting); AR 667 (5/3/2007 IEP meeting). In April and November of 2006, the District considered placing Sarah in a special public school, an option that was rejected as too restrictive. AR 1293, 1335. In February 2007, the District considered placing Sarah at a private day school, and again rejected placement in a separate facility as too restrictive. AR 1354. The IEP paperwork from the February meeting notes that "parents felt [private day school placement] was an option but were willing to try instructional until April-May." Id. In May 2007, the District again considered a private placement for Sarah and concluded that Sarah's needs were met at Pritchett, and that a private placement would be too restrictive. AR 667.

---

[12] The degree to which a placement option is restrictive turns on the amount of time that it calls for the student to be educated in the regular classroom with nondisabled peers. The more time a placement allows the student to be in the regular classroom, the less restrictive it is considered, and vice versa. The instructions for this section state: "The IEP team must begin with the least restrictive setting and only consider more restrictive settings if the less restrictive alternative is not appropriate." AR 1293. These instructions are consistent with the IDEA's LRE requirement.

The minutes from the May 2007 IEP meeting demonstrate that the District representatives and Plaintiffs specifically discussed placing Sarah at a private day school. AR 1365-67. The minutes indicate that Plaintiffs thought Sarah should be at "a different school so that she has other students like her" because she was increasingly aware of her difficulties reading. AR 1365-66. The regular school teacher "questioned how a huge change into a new school would affect Sarah given the fact that she doesn't do well with change." AR 1366. Again, the District concluded that placement at Pritchett was appropriate, and that, consequently, a private placement would not be the least restrictive environment. Plaintiffs dissented. AR 679.

As noted above, the District had an obligation to place Sarah in the LRE in which she could receive a FAPE. Sarah's IEPs indicate that the District considered a continuum of placement options, and concluded that Sarah could receive a FAPE at Pritchett, that a private school would be a more restrictive environment, and that therefore placement at the private school would violate the Act.[13] Therefore, Plaintiffs' contention that the school failed to consider a continuum of placements fails.

### B. Substantive Arguments

#### 1. Whether Sarah's IEPs Addressed All of Her Needs

Under the IDEA, an IEP must include "a statement of measurable annual goals, including academic and functional goals, designed to – (aa) meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and (bb) meet each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(i)(II). In view of this requirement, the Seventh Circuit has held that "[t]o meet the second, substantive criterion of *Rowley*, an IEP must respond to all

---

[13] The District's conclusion that Sarah could receive a FAPE at Pritchett and whether her placement at Pritchett was appropriate are addressed below.

significant facets of the student's disability, both academic and behavioral." *Alex R.,* 375 F.3d at 613 (holding that "IEP that fails to address disability-related actions of violence and disruption in the classroom is not 'reasonably calculated to enable the child to receive educational benefits'"). Plaintiffs argue that Sarah's IEPs failed to address her needs in the areas of executive functioning, anxiety, and handwriting problems, and therefore denied her a FAPE. The IHO concluded that the District adequately addressed Sarah's executive functioning and socio-emotional needs, and did not specifically address the handwriting issue. The Court will address each of the disputed areas in turn.

Executive functioning is the ability to timely and independently initiate a task, plan, organize, shift from one thing to the next, and hold information in memory. Pl. SOF ¶ 41. Plaintiffs claim that executive functioning was an area of concern for Sarah that the District recognized but refused to address. The District disputes that claim, contending that executive functioning was not an area of significant concern for Sarah, and thus the IEP did not specifically address it.

In her November 2006 psychoeducational evaluation of Sarah, the school psychologist analyzed Sarah's executive functioning based on assessments submitted by Sarah's regular and special education teachers and by Sarah's mother. AR 1016, 1022. According to the school psychologist's report, both Sarah's mother and her regular teacher "indicate[d] appropriate executive functioning abilities across all areas." AR 1022. The special education teacher's assessment indicated that executive functioning may be an area of concern for Sarah. *Id.*, AR 2228. Based on the three assessments, which showed that Sarah's executive functioning was inconsistent across settings, the school psychologist concluded that Sarah's executive functioning abilities may decrease when she is performing academically demanding tasks. AR

2226, 2228. At the due process hearing, the school psychologist explained that "someone who has a deficit in executive functioning would show deficit across the different settings." AR 2228. Because Sarah did not show a deficit in all settings – for example at home or in the regular classroom – the psychologist concluded that Sarah did not have a deficit in executive functioning. When questioned about Sarah's executive functioning, the special education teacher testified that Sarah had some problems with her memory, and "shifting from one thing to another thing," but that Sarah was "pretty good" at planning ahead "most of the time." AR 1842. The preponderance of the evidence supports the IHO's conclusion that the District adequately addressed Sarah's in executive functioning needs, and did not deny her a FAPE by not including any goals related to executive functioning in Sarah's IEP.

Plaintiffs also contend that the District failed to address Sarah's clinically significant anxiety in her IEP. In the November 2006 psychoeducational evaluation of Sarah, the school psychologist assessed Sarah's emotional and behavioral functioning by asking Sarah, her mother, and Sarah's special education and regular teachers to complete the *Behavioral Assessment for Children – Second Edition* ("BASC-2"). AR 1024. The BASC-2 completed by the special education teacher indicated that Sarah had clinically significant anxiety. *Id.* Sarah's own evaluation indicated that she was at risk for depression and self-esteem problems. *Id.* In order to further assess Sarah's potential anxiety, depression, and self-esteem issues, the school psychologist had Sarah complete four additional assessments. *Id.* Those assessments showed that Sarah was experiencing "age-appropriate levels of anxiety," that her level of depression was average, and that her self-esteem was "average in comparison to her same-age peers." AR 1024. In light of these inconsistent results, the school psychologist concluded that Sarah's anxiety,

depression, and self-esteem were not areas of significant concern, but that those areas should be informally monitored. *Id.*

The school social worker testified that, based on the school psychologist's report, the IEP team decided that the areas of anxiety, depression, and self-esteem could be informally monitored, and that no additional social work minutes were needed at that time. AR 2448. Therefore, no IEP goal addressing anxiety was added at the December 2006 IEP meeting. AR 2242.

The record evidence indicates that in the spring of her third grade year, Sarah became more emotional. See AR 2462 (school social worker testifying that on April 30th she spoke to Sarah's mother, who stated that Sarah was experiencing stress and was worried about being held back); AR 2689 (Sarah's mother testifying that in April 2006 she noticed that Sarah was "weepy" at home and reported that to the special education teacher). At the May 2007 IEP meeting, the IEP team added 20 minutes of social work time to Sarah's IEP to address her increased "emotionality." AR 2469.

This evidence indicates that the District was actively monitoring Sarah's anxiety and other emotional needs, that such needs did not become an area of significant concern until the Spring of 2007, and that twenty additional individual social work minutes and a social work goal addressing anxiety were added to Sarah's IEP at that time. Therefore, the Court concludes that the testimonial and documentary evidence support the IHO's conclusion that the District adequately addressed Sarah's social-emotional needs, and Plaintiffs have not met their burden of demonstrating that the IHO erred in reaching that conclusion.

Finally, Plaintiffs argue that the District failed to address Sarah's handwriting needs. The IHO did not address the issue of Sarah's handwriting, and it was not raised in Plaintiffs' due

process complaint. AR 18-20. Therefore, the issue has been waived. See *Reed v. Lincoln-Way Community High School Dist.*, 2000 WL 696793, at *5 (N.D. Ill. May 30, 2000) (finding that plaintiff had forfeited the opportunity to present a new argument before the Court where it had not been raised before the IHO and concluding that the opportunity to present additional evidence to the federal court does not extend jurisdiction to matters not raised at the administrative level).

Moreover, even if Plaintiffs had not waived the issue, their claim would fail. The record evidence indicates that Sarah's mother complained about Sarah's poor handwriting at the December 8, 2006 IEP meeting. AR 1315. Two months later, at the February 8, 2007 IEP meeting, the mother specifically requested that a handwriting goal be added to Sarah's IEP. AR 1347. In response to the mother's request, a handwriting goal was added to Sarah's IEP that day. AR 1353, 2766, 2792. Far from demonstrating that the District failed to address Sarah's handwriting needs, the evidence shows that the District listened and responded to Plaintiffs' concerns, and thereby gave them a meaningful opportunity to participate in the decisionmaking process regarding Sarah's IEP, as required by the IDEA.[14]

### 2. Whether Sarah's IEP Was Reasonably Calculated to Confer Educational Benefits

Plaintiffs' primary claim is that Sarah was denied a FAPE because her IEP was not reasonably calculated to confer educational benefit, as required by the substantive prong of the

---

[14] Plaintiffs also complain that when the District wrote a handwriting goal, it failed to provide occupational therapy services to help improve Sarah's handwriting. But the IDEA requires only that the IEP be reasonably calculated to enable the child to receive educational benefits, not that it "educate a handicapped child to her highest potential." *Murphysboro*, 41 F.3d at 1166 (citation omitted). Plaintiffs point to no evidence indicating that Sarah could not receive benefits from a handwriting goal implemented without occupational therapy. Therefore, the Court cannot conclude that the District's handwriting goal violated the IDEA.

*Rowley* analysis.[15]  As noted above, an IEP is reasonably calculated to confer educational benefit when it is "'likely to produce progress, not regression or trivial educational advancement.'" *Alex R.*, 375 F.3d at 615 (citation omitted).  The amount of likely progress required varies with a student's abilities.  *Id.*  Here, the parties dispute both how much progress – if any – Sarah made, and whether that amount of progress was satisfactory under the IDEA.

*a.    Evidence of Sarah's Progress*[16]

In support of their argument that Sarah did not make sufficient progress at Pritchett, Plaintiffs rely on the following: (1) Sarah did not master her IEP goals, and a number of goals were repeated from year to year; (2) Sarah's score on the WIAT II, a standardized achievement test, fell between kindergarten and third grade; and (3) Sarah was well below her grade level reading at the end of third grade.

The District counters that (1) Sarah made progress towards mastering her IEP goals; (2) the WIAT II does not show lack of progress because it is not designed to measure an individual student's progress over time; (3) Sarah's increased scores on the MAP test, an achievement test, indicate progress; and (4) that Sarah's teachers testified that she was making progress.

The IHO concluded that Sarah had made progress based on (1) her progress toward mastery of her IEP goals; and (2) the testimony of Sarah's teachers regarding her progress,

---

[15] In Count I of the complaint and in their motion for summary judgment, Plaintiffs argue that the IHO applied an incorrect standard in determining whether Sarah received a FAPE.  Upon closer examination, it is apparent that Plaintiffs' argument is not that the IHO applied the wrong standard, but that he did not properly apply the standard to the facts of this case.  In short, they disagree with his conclusion that Sarah's IEP was reasonably calculated to enable her to make meaningful progress.

[16] The Court notes that the pertinent inquiry is not whether Sarah's IEPs actually produced progress, but whether they were reasonably likely to do so.  Therefore, some courts have held that a student's lack of progress "is not dispositive."  *M.S. ex rel. Simchick v. Fairfax County School Bd.*, 553 F.3d 315, 327 (4th Cir. 2009); see also *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 530 (3d Cir.1995) ("appropriateness is judged prospectively so that any lack of progress under a particular IEP, assuming *arguendo* that there was no progress, does not render that IEP inappropriate").  However, actual progress certainly is relevant to whether the IEPs were reasonably calculated to confer educational benefit.

including her ability to apply what she learned in the classroom in other settings, and her ability to interact with a broad peer group, and her improved MAP scores. AR 6, 13. In view of its obligation to independently evaluate the evidence, the Court will consider each category of evidence in turn.

*(i).    Sarah's IEP Goals*

Plaintiffs contend that Sarah's failure to master her IEP goals, and the fact that a number of the goals consequently were repeated from year to year, indicate that she did not make sufficient academic progress. But courts have held that a student's failure to master IEP goals does not compel the conclusion that the IEP was not reasonably calculated to provide a FAPE, particularly where the student made progress towards achieving those goals. See *O'Toole By and Through O'Toole v. Olathe Dist. Schools Unified School Dist. No. 233*, 144 F.3d 692, 707 (10th Cir. 1998) (where student was "making adequate progress on" IEP goals, "[t]he fact that she had not fully met most of those objectives [did] not indicate she was not getting educational benefit"). Likewise, the mere fact that a student's IEP goals are continued does not necessarily mean that the similar IEPs were not reasonably calculated to confer educational benefit. See *Schroll v. Bd. of Ed. of Champaign Comm. Unit Sch. Dist. #4*, 2007 WL 2681207, at *5 (C.D. Ill. Aug. 10, 2007) ("[a]n IEP is not inappropriate simply because it does not change significantly on an annual basis * * * [or] because the student does not meet any of the IEP goals") (citing *Carlisle Area Sch. v. Scott P.*, 62 F.3d 520, 533-34 (3rd Cir. 1995)). For example, in *Carlisle*, the Third Circuit rejected an argument that the 1992-93 IEP was not appropriate because of its similarity to the 1991-92 IEP, reasoning that "Scott's failure to make progress in the 1991-92 IEP, a judgment made retrospectively, does not render either the 1991-92 IEP or the 1992-93 IEP inappropriate." 62 F.3d at 534. However, if a student makes "no progress under a particular IEP in a particular year, * * * the propriety of an identical IEP in the

next year may be questionable." *Schroll*, 2007 WL 2681207, at *5; see also *Carlisle,* 62 F.3d at 534 ("where a student fails to make any progress under an IEP in one year, we would be hard pressed to understand how the subsequent year's IEP, if simply a copy of that which failed to produce any gains in a prior year, could be appropriate"). Therefore, to the extent that Sarah's IEP goals were not mastered and were repeated, the proper inquiry is whether she made any progress on those goals, such that the District could reasonably have concluded that those goals were "likely to produce progress" the next year.

Turning to the IEP goals at issue, Sarah's special education teacher conceded that many of the "goals and short term objectives [in Sarah's IEPs] look the same," but explained that "if you read the PLOPS [present level of performance] and all the statements, [the IEPs] were very different." AR 1994. The comments and PLOPs in Sarah's IEPs support the special education teacher's testimony, and indicate that Sarah did make some progress in achieving her IEP goals each year.

For example, one short term objective that was repeated in each of Sarah's IEPs was the following: "when given a list of Dolch (220) Sight words in isolation or in a reading passage, Sarah will 1) point to 2) read those words 8 of 10 times she is assessed. See AR 1259 (5/6/05 IEP); AR 1279 (4/20/06 IEP); AR 1383 (5/3/07 IEP). The PLOPs indicate that Sarah's mastery of the 220 Dolch Sight words improved over time. AR 1259 (7% mastery on 5/6/05); AR 1279 (22% mastery on 4/20/06); AR 1383 (56.8% mastery on 5/3/07);[17] see also AR 1946 (special education teacher testifying that Sarah "was growing on" the Dolch sight words).

---

[17] The special education teacher testified that the percentages of mastery were based on the complete list of 220 words, but that Sarah was not expected to learn all 220, but to learn a subset based on her grade level. AR 1881. Therefore, while Sarah had mastered only 7% of the 220 words at the end of her first grade year, she had learned a higher percentage of the words she was being taught.

The PLOPs also indicate that Sarah's reading level increased, though slowly, over time. At the end of her first grade year, Sarah was reading short a and i vowel patterned books and level A and B lexile books with beginning fluency and comprehension. AR 1260 (5/6/05 IEP). Approximately a year later, Sarah was reading short a and i, o, u, e vowel patterned books and level A and B lexile books with beginning fluency and comprehension. AR 1281 (4/20/06 IEP). Near the end of her third grade year, Sarah had read 35 books at an average level of 1.4. AR 1368 (5/3/07 IEP).

Sarah's IEPs also indicate that her reading comprehension improved. At the end of her first grade year, when a paragraph or story was read to her, Sarah could answer 1-2 questions about character and setting with teacher prompts. AR 1260. By the spring of her second grade year, she could answer 2-3 such questions with no assistance. *Id.* At the end of third grade, after listening to a variety of passages, Sarah could answer literal questions correct 70-80% of the time. AR 1384.

Based on its evaluation of this evidence, the Court concludes that Plaintiffs have failed to show that the IHO's conclusion that Sarah was making "slow but persistent progress toward mastery of her IEP goals" was erroneous. AR 13.

*(ii). WIAT II Testing*

Sarah's scores on the WIAT II, a standardized achievement test, fell between kindergarten and third grade. Compare AR 987 to AR 1001. In kindergarten, Sarah received a score of 85 on the word reading portion of the WIAT II. AR 987. Sarah received a score of 66 on the word reading portion of the WIAT II when she again took the test in the third grade. AR 1001. Sarah's scores also dropped on the other portions of the WIAT II between kindergarten and third grade. AR 987, 1001. Sarah's percentile rank also fell between kindergarten and the third grade. Compare AR 987 to AR 1001; see also AR 1835 (IHO stating that "the record

indicates that her percentile rank when compared on the national average went down"). According to Plaintiffs, the drop in Sarah's scores indicates that she made no progress at Pritchett.

The IHO concluded – and the District maintains – that Sarah's scores on the WIAT II do not show a lack of progress. The IHO based that conclusion, in part, on testimony that the WIAT II does not measure a student's progress over time, but rather compares a student to her peers. AR 6. In addressing the WIAT II results, the IHO stated that Sarah scored "in the first percentile on the WAIT II [sic] in kindergarten and again in 3rd grade." *Id.*; see also AR 2046 (IHO stating that, as he recalled, Sarah "remained at the same percentile" on the WIAT II). However, Sarah's percentile rank did not remain the same, as the IHO erroneously recalled, but instead dropped from kindergarten to third grade. In light of this factual error, the Court will not accord any deference to the IHO's determination that the WIAT II did not show a lack of progress. Nevertheless, the Court's independent review leads it to the same conclusion.

The school psychologist testified that the WIAT II is not designed to measure a student's growth, but "to look at how that child is doing * * * in comparison to their same age peers." AR 2292-93. Similarly, Dr. Thompson testified that the drop in Sarah's scores and percentile indicated that "relative to her peers, * * * her performance actually went down." AR 2519-20. Based on this testimony, the Court concludes that Sarah's WIAT II scores do not necessarily show a lack of individual progress, which is at issue here. See *Houston Independent School Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000) ("a disabled child's development should be measured not by his relation to the rest of the class, but rather with respect to the individual student"). The decrease in Sarah's percentile score does not alter this conclusion. While Dr. McCanna testified that "if you learned nothing, your percentile should drop on a normed test,"

AR 2633, it is equally possible that Sarah did progress, but that her percentile score dropped nonetheless because she progressed at a slower rate than her non-disabled peers. See *Houston Independent School Dist.*, 200 F.3d at 349 (noting that "declining percentile scores do not necessarily represent a lack of educational benefit, but only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers"). Therefore, at most, Sarah's declining percentile score shows that she was not progressing as fast as her peers.

*(iii).   MAP Testing*

In the fall of her third grade year, Sarah took the Measures of Academic Progress or the "MAP" test. AR 2722. At that time, she received a score of 179 on the mathematics portion of the MAP test, and a 156 on the reading portion. AR 714. When Sarah took the MAP test again in the spring of that year, she received a 188 in math and a 184 in reading. *Id.* Sarah's score on the reading portion increased by 28 points, well above the typical increase on that portion of 16 points. AR 2724. In the fall, Sarah scored in the 1st percentile in reading; in the spring she scored in the 16th percentile. AR 2295. Sarah had approximately twice as long to complete the test the second time that she took it. AR 1737. When Sarah took the MAP assessment in the Spring her special education teacher sat beside her. AR 1922-23.

The District maintains that Sarah's improved scores are evidence that she was progressing at Pritchett. Plaintiffs disagree, and attribute Sarah's improvement to the changes in testing conditions between the fall and spring administrations of the test.

The assistant school principal testified that the MAP test can be used to measure a student's individual growth, AR 2737, and that Sarah's improvement on the reading portion of the MAP test showed growth that "far exceeded the typical growth that we would hope for." AR 2737-38 (based on fact that Sarah's reading score improved much more than the norm). The

school psychologist testified that Sarah's improvement on the reading portion of the MAP test – in particular, the fact that she went from the 1st percentile to the 16th percentile – showed that she was making progress. AR 2295-96 (stating that her move "from the first to the 16th percentile * * * [was] a huge difference" because when you start with a very low percentile score, "it takes a lot for your percentile to change"); AR 2325 (calling Sarah's improvement on the MAP reading test "a definite sign of improvement").

The IHO concluded that Sarah's improvement on the MAP test could not be attributed to the changed testing conditions because Sarah's gains in math and reading were not uniform, as he concluded would be expected if the gains were attributable to changes in the testing conditions. AR 6-7. Instead, he concluded that Sarah's improved scores showed that "she learned what was taught to her by her teachers." AR 7.

"An assessment of educational progress is a type of judgment for which the district court should defer to the [IHO's] educational experience." *Frank G. v. Board of Educ. of Hyde Park*, 459 F.3d 356, 367 (2d Cir. 2006) (citation omitted). On the evidence and argument adduced here, the Court finds no reason not to defer to the IHO's conclusion that Sarah's performance on the MAP test shows progress in terms of her reading ability.

*(iv). Testimony of Sarah's Teachers*

A number of Sarah's teachers testified that she was making progress. For example, Sarah's special education teacher testified that she "saw an overall progression * * * of behavior and academics," AR 2050, in Sarah over the three years she taught her, AR 1799. Specifically, the special education teacher testified that, at the beginning of her first grade year, Sarah "knew very little alphabet." AR 2050. Over the next three years, "[s]he learned the alphabet. She was working on sounds. She was spelling words. She felt success with some reading. She was learning some basic math facts." *Id.* The special education teacher also testified that, during

Sarah's third grade year, she "saw a big success * * * in terms of [Sarah's ability to] communicat[e] better." AR 1961.

The school speech pathologist, who also worked with Sarah for three years, testified that she observed progress in Sarah as well. For example, the speech pathologist testified that, in her third grade year, Sarah was "making a lot of progress" in the making multisyllable words. AR 2412-13. Because the abilities that go into making multisyllable words "are all precursors to reading," Sarah's progress led the speech pathologist to conclude that "developmentally reading may be soon to follow." *Id.* The speech pathologist also saw progress in Sarah's "ability to put together a sentence," which improved from Sarah using "mostly three word phrases" to using "six to eight word sentences" to express her ideas and thoughts. AR 2431. Finally, she observed Sarah applying the strategies that she learned in the special education classroom in another environment – the regular education classroom – which demonstrated that Sarah was learning. AR 2418.

### *(v). Reading Level*

Sarah's May 6, 2005 IEP indicates that at that time – the end of her first grade year – Sarah was reading at an "end Kindergarten level." AR 1259. In November 2006, the fall of Sarah's third grade year, the school psychologist conducted a comprehensive psychoeducational evaluation of Sarah as part of her 3-year re-evaluation to assess her cognitive abilities, processing skills, and emotional and behavioral functioning. AR 1008. In that evaluation, the school psychologist reported that Sarah was "functioning below the first grade instructional level" in reading. AR 1023. The evaluation also indicated that Sarah had difficulty writing alphabet letters from memory. *Id.* In February of her third grade year, Sarah was reading at an average level of 1.4. AR 1350 (2/7/07 IEP). Sarah's average reading level remained at 1.4 at the end of her third grade year. AR 1383 (5/3/07 IEP). In June 2007, Sarah underwent an

independent psychoeducational evaluation conducted by Dr. McCanna and Dr. Thompson. AR 962. Based on that evaluation, Dr. McCanna testified that "in reading and writing [Sarah] was scoring in the very impaired range in the first grade level or sometimes below that." AR 2598.

B.     <i>Sufficient Progress</i>

Based on its evaluation of the evidence above, the Court concludes that Sarah made some academic progress. The next question is whether she made *enough* progress. In the Seventh Circuit, "[t]he requisite degree of reasonable, likely progress varies, depending on the student's abilities." *Alex R.*, 375 F.3d at 615.

The parties agree that Sarah has low average cognitive ability, AR 1018, and severe developmental dyslexia, Def. Resp. Pl. SOF ¶ 5. Plaintiffs maintain that Sarah should make nine months of progress each school year, a prediction they base on the testimony of Dr. Thompson, Dr. McCanna, and Sarah's special education teacher. AR 2513 (Dr. Thompson predicting nine months progress in reading based on Sarah's IQ); AR 2622-23 (Dr. McCanna stating that "kids with dyslexia" generally make "three quarters to a year improvement through the first couple years of intervention"); AR 1857 (Sarah's special education teacher stating that she "would hope" that Sarah would make nine months of progress in a school year).

The IHO concluded that Plaintiffs had failed to establish that Sarah should make nine months of progress each school year. AR 13. The IHO did not find the private evaluators' testimony credible on this point because "they had incomplete knowledge" of Sarah, and their predictions were "not backed up by scientifically researched data * * * [or] based on the student's response to intervention." *Id.* This Court defers to the credibility determinations of the IHO, who "had the opportunity to observe the witnesses and use [his] experience to make credibility judgments." *Michael R.*, 2005 WL 2008919, at *23; see also *Beth B. v. Van Clay*, 211

F.Supp.2d 1020, 1028 n.2 (N.D. Ill. 2001) (giving "great deference to the IHO's credibility determinations"). While the IHO did not specifically address the special education teacher's testimony on this point, the Court notes that her statement appears to have been more aspirational than prognostic.[18] Therefore, the Court concludes that Plaintiffs have failed to show that, in Sarah's case, only an IEP that is likely to produce nine months of progress per year is adequate.

Courts in factually analogous cases have found that much less than nine months progress per school year is sufficient progress under the IDEA. See *E.S. v. Independent School Dist., No. 196 Rosemount-Apple Valley*, 135 F.3d 566, 567-69 (8th Cir. 1998) (finding that dyslexic student "was making progress and that the * * * proposed IEP would have provided educational benefit to her" where her broad reading skills improved from a 3.0 grade-level to a 3.8 grade-level and her broad written language improved from a 2.7 grade level to a 3.1 grade level in three years between the 4th and 7th grade); *Houston Independent School Dist.*, 200 F.3d at 350 n.3 (upholding district court's conclusion that dyslexic student had enjoyed academic benefits from the IEP where student's written language improved from the 1.5 grade level to 1.9 and basic reading skills rose from 1.8 to 2.1 in two years).

The bulk of the record evidence – including documentary evidence that Sarah made progress towards mastering her IEP goals, Sarah's improvement on the MAP test, and the testimony of her teachers Sarah's teachers that she was making progress – supports the IHO's conclusion that Sarah's IEP was reasonably calculated to confer educational benefit. The Court recognizes that certain aspects of the record may cut the other way. For example, at the end of

---

[18] Plaintiffs argue that the IHO's decision should be overturned because he "erroneously dismissed" the testimony of the private evaluators and "ignored" the special education teacher's testimony on this point. Cmplt. ¶ 62. But, as noted above, "[t]he fact that the IHO credited some witnesses over others and chose not to address every witness' testimony in [his] opinion is not a basis to overturn [his] decision." *Michael R.*, 2005 WL 2008919, at *23.

her first grade year, Sarah was reading at an "end Kindergarten level." AR 1259. In the third grade, Sarah was still functioning below the first grade reading level. See AR 1023 (school psychologist's November 2006 report); AR 2598 (June 2007 independent psychoeducational evaluation).

Because the Court has not considered any additional evidence regarding Sarah's progress while at Pritchett, even a disagreement with the hearing officer would not be enough to justify setting aside the latter's order; the court "must be strongly convinced that the order is erroneous." *Dale M.*, 237 F.3d at 815 (7th Cir. 2001). While the Court certainly appreciates Plaintiffs' frustration with the speed and magnitude of that progress, the Court is not "strongly convinced" that the IHO erred in concluding that Sarah's progress was more than trivial, an assessment that he made based on his educational experience. *Frank G.*, 459 F.3d at 367 ("assessment of educational progress is a type of judgment for which the district court should defer to the [IHO's] educational experience"). Therefore, the Court cannot set aside the IHO's conclusion that the District provided Sarah with a FAPE as required by the IDEA.

### 3. Appropriateness of Sarah's Placement

Having determined that the District can provide Sarah with a FAPE, the question becomes whether Pritchett is the LRE. Because the IDEA requires that students receive a FAPE in the LRE, if Pritchett is the LRE, then Sarah's placement there was appropriate. See *Casey K. ex rel. Norman K. v. St. Anne Community High School Dist. No. 302*, 2006 WL 2361881, at *11 (C.D. Ill. Aug. 14, 2006) ("Because this court has determined that the District can provide FAPE to Casey, the fact that a placement in the District is also the LRE indicates that it is a more appropriate placement than Acacia.").

The LRE is the environment in which the student is being mainstreamed – meaning, educated with her nondisabled peers – to the greatest extent appropriate. *Beth B.*, 282 F.3d at 498. Under the proposed IEP for her 4th grade year, Sarah would have spent approximately 30% of her day with non-disabled peers at Pritchett, her neighborhood school. AR 1355. At HPDS, Sarah would have had no interaction with non-disabled students. Because this Court has determined that Sarah can be satisfactorily educated there, Pritchett is the LRE, and removing Sarah from Pritchett would violate the IDEA. *Beth B.*, 282 F.3d at 499. Therefore, Sarah's placement at Pritchett was appropriate.

Plaintiffs advance a number of arguments for their view that HPDS, not Pritchett, is the appropriate placement for Sarah. First, Plaintiffs argue that Sarah's placement at Pritchett could be considered more restrictive than HPDS, because the proposed IEP called for a lot of one-on-one instruction during which Sarah would be isolated from her peers. While the Court is sympathetic to Plaintiffs' concern that Sarah have the maximum interaction with children her age, regardless of their disabilities, the IDEA seeks to maximize the contact that disabled children have with nondisabled children. See *Beth B.*, 282 F.3d at 497 ("[t]he LRE requirement shows Congress's strong preference in favor of mainstreaming"); *Carlisle Area Sch.*, 62 F.3d at 535 (rejecting argument that residential placement was appropriate because it would maximize student's contact with disabled peers because, by "necessarily minimiz[ing the student's] contact with children without disabilities," such a placement would "directly conflict[] with the statute's objective of inclusion"). Congress thus has made a policy choice in favor of mainstreaming to which school administrators and this Court must adhere. For these reasons, the argument that the proposed placement was not the LRE fails.

Plaintiffs also claim that HPDS is a more appropriate placement for Sarah because she is making progress there. However, Sarah' progress at HPDS – even if it is significantly greater than her progress at Pritchett – does not establish that the District's IEPs were inappropriate. See *Walczak v. Florida Union Free School Dist.*, 142 F.3d 119, 133 (2d Dist. 1998) ("The inadequacy of an IEP is not established * * * simply because parents show that a child makes greater progress in a single area in a different program"); *Fuhrmann v. East Hanover Bd. of Educ.,* 993 F.2d 1031, 1039-40 (3d Cir. 1993) (student's "dramatic progress" in alternative program chosen by parents does not, by itself, establish that proposed IEP was not "reasonably calculated to enable the child to receive educational benefits"); *O'Toole*, 144 F.3d at 708 ("the fact that she made more progress, and by her parents' account was happier, at the CID, does not compel the conclusion that the CID was the appropriate placement for her under the IDEA and Kansas law, and that her IEP as implemented at SEC was inappropriate"). As the Seventh Circuit explained in *Heather S.*, "[t]he issue is whether the [Pritchett] placement was appropriate, not whether another placement would also be appropriate, or even better for that matter. The school district is required by the statute and regulations to provide an appropriate education, not the best possible education." 125 F.3d at 1057; see also *Murphysboro*, 41 F.3d at 1166 (the IDEA does not require a school district "to educate a handicapped child to her highest potential") (citation omitted).

Finally, Plaintiffs' argument that placement at HPDS is appropriate because Sarah needs an integrated program of multi-sensory repetition and direct instruction, which they contend she cannot get at Pritchett, is equally unavailing. The Seventh Circuit has consistently recognized that the IDEA "leave[s] the selection of educational policy and methods where they traditionally have resided – with state and local school officials." *Beth B.*, 282 F.3d at 498 (noting that the

*Rowley* "standard is intended to give school districts 'flexibility in educational planning'") (citations omitted); *Heather S.*, 125 F.3d at 1054 ("educational methods are left up to the states; they are obligated only to comply with the requirements of the IDEA"); *Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290, 294 (7th Cir. 1988) ("once a court determines that the requirements of the Act have been met, questions of methodology are for resolution by the State") (quoting *Rowley*, 458 U.S. at 208). Because the District has complied with the IDEA, this Court cannot compel it to employ certain teaching methods or to pay for students to attend a school that does so. Moreover, monitoring the District's methodologies in that manner would run afoul of this Court's obligation not "to substitute '[its] own notions of sound educational policy for those of the school authorities which [it] review[s].'" *Murphysboro*, 41 F.3d at 1166 (quoting *Rowley,* 458 U.S. at 206).

### C. Reimbursement For Unilateral Placement

Plaintiffs contend that they are entitled to reimbursement for the costs of sending Sarah to HPDS for instruction. As the Supreme Court recently confirmed, a school district must reimburse parents for a child's unilateral placement in a private program if the court determines (1) that the private placement desired by Plaintiffs was proper and (2) that the school district's proposed IEP was inappropriate. *Burlington v. Dep't of Educ.*, 471 U.S. 359, 370 (1985); see also *Forest Grove School District v. T.A.*, 129 S.Ct. 2484, 2492 (2009) (reaffirming holding in *Burlington*). "Reimbursement for private education costs is appropriate only when public school placement under an individual education plan (IEP) violates IDEA because a child's needs are not met." *Patricia P. v. Board of Educ. of Oak Park*, 203 F.3d 462, 469 (7th Cir. 2000) (quoting *Schoenfeld v. Parkway Sch. Dist.,* 138 F.3d 379, 380-82 (8th Cir. 1998)).

Plaintiffs correctly note that the fact that HPDS may be a more restrictive environment than the District's proposed placement does not bar reimbursement. See, e.g, *Murphysboro*, 41 F.3d at 1168 (LRE requirement was not developed to promote integration at the expense of other IDEA requirements and does not apply unless the education is appropriate). However, under the unilateral placement standard, Plaintiffs first must meet their burden of showing that the school district's proposed IEP was inappropriate. Only then does consideration of whether Plaintiffs' preferred unilateral placement is appropriate such that reimbursement is available arise. Because Plaintiffs' have failed to show that the proposed IEP was inappropriate, Plaintiffs are not entitled to reimbursement.

### D. Shifting the Responsibility of FAPE to Plaintiffs

In Count III of the Complaint, Plaintiffs allege that the IHO incorrectly blamed them for the District's failure to provide Sarah with a FAPE by illegally holding them, as opposed to the District, responsible for providing a FAPE. This argument fails. Because the IHO did not conclude that Sarah did not receive a FAPE while she was at the district school, it would have been impossible for the IHO to hold Sarah's parents responsible for a failure that he found did not occur. In all of the cases cited by Plaintiffs in support of this argument, the court found that the school district failed to provide a FAPE or otherwise violated the IDEA, and rejected the district's attempt to shift blame to Plaintiffs. See *Seattle Sch. Dist. No. 1 v. B.S.*, 82 F.3d 1493, 1501 n.4 (9th Cir. 1996) (rejecting district's argument that attempted to shift blame to parents and affirming district court conclusion that district's plan failed to provide FAPE); *Justin G. v. Bd. of Educ. Of Montgomery County*, 148 F.Supp. 2d 576, 586 (D. Md. 2001) (where parties did not dispute that the school district had failed to develop an IEP for the student, finding that parents' conduct did not justify denial of tuition reimbursement); *Briere v. Fair Haven Grade*

*Sch. Dist.*, 948 F.Supp. 1242, 1254 (D. Vt. 1996) (rejecting district's argument that parent was to blame for IDEA violation); *A.D. v. Sumner Sch. Dist.*, 166 P.3d 837, 847 (Wash. App. 2007) (rejecting school's argument that parents were somehow to blame for procedural violations of IDEA). Because the IHO found no IDEA violations, he could not have blamed Plaintiffs for any such violations.

### E. Attorney Fees

In an IDEA case such as this, a "court, in its discretion, may award reasonable attorneys' fees as part of the costs * * * to a prevailing party who is the parent of a child with a disability." 20 U.S.C. § 1415(3)(B)(i)(I). However, where a party does not prevail or prevails in only a de minimis fashion, the party is not entitled to any award. *Monticello Sch. Dist. No. 25 v. George L.*, 102 F.3d 895, 907 (7th Cir. 1996). Because Plaintiffs have not prevailed, their request for attorney fees is denied.

## IV. Conclusion

For the foregoing reasons, Plaintiffs' motion for summary judgment is denied, and the District's cross-motion for summary judgment is granted.

Dated: July 22, 2009                    _____
                                        Robert M. Dow, Jr.
                                        United States District Judge